[No. 27871. Department One. November 27, 1940.]

*In the Matter of the Estate of* LARS PETERSON, *Deceased.*

C. A. J. TAYLOR, *as Administrator, Respondent,*

v. MINA B. QUILLIN *et al., Appellants.*[1]

[1]Reported in 107 P. (2d) 580.

*W. C. Hinman,* for appellants.

*James C. McKnight,* for respondent.

ROBINSON, J.—This is an appeal from orders striking objections to the final report of the administrator *de bonis non* of the estate of Lars Peterson, and from the decree and order approving the final report.

The estate is, or rather was, of considerable value. From the last of the three former cases concerning it, which reached this court, *National Bank of Commerce*

*v. Peterson,* 179 Wash. 638, 38 P. (2d) 361, we quote as follows:

"On September 20, 1924, Lars Peterson died in Seattle leaving an estate, the real property of which was appraised at $224,500 and the personal property appraised at $18,512.05, totalling $243,012.05. At the time of his death, there were mortgage and contract indebtedness against the property in the sum of $63,028.36.

"Notice to creditors was published October 7, 1924. The following claims were filed: Seattle National Bank, on a promissory note, unsecured, for $6,000; C. A. J. Taylor, unsecured, for $1,500; and Bonney-Watson Co. for funeral expenses, unsecured, for $2,800. These were allowed and fully paid by the administrator L. A. Peterson. A claim for $234,666.66 by Neola Taylor Higgins was rejected by the administrator, was sued upon, the rejection sustained, the cause appealed and affirmed by this court on February 7, 1929. *Higgins v. Peterson,* 150 Wash. 620, 274 Pac. 186. In that and a preceding case, *In re Peterson's Estate,* 137 Wash. 137, 241 Pac. 964, L. A. Peterson was successful in substantiating himself as the son and sole heir of Lars Peterson, and the claim of Neola Taylor Higgins for the whole estate was defeated."

In that opinion, this court also took occasion to say:

"In passing, we wish to observe that our probate statute, Rem. Rev. Stat., § 1517 [P. C. § 9885], makes it the duty of every administrator to settle the estate in his hands as rapidly and as quickly as possible without sacrifice to the estate. We are powerless, as the trial judge in this case probably also felt, to compel more speedy action on the part of the administrator, as directed by the statute, within any specified time. He seems, however, to have been managing the estate as if he were the sole owner, or at least under a non-intervention will giving him sole authority. This last is, of course, not true. There seems to be no reason why the estate should not be settled."

Although this rather pointed suggestion was made by this court on December 10, 1934, no final report and

petition for distribution was filed for nearly four years; and when it was filed on November 1, 1938, although the original administrator started out with net assets of about $180,000, and with little more than $10,000 in claims, and although the moneys received during the entire administration amounted to $326,978.90, and the expenses to $258,876.58, a difference of $68,102.32, the report showed that there was nothing at all left for distribution, and, in fact, that the attorney for the administrator would have to forego $3,568 of the fees which had been allowed him by the court.

To this report, Mina B. Quillin and Neola Taylor Higgins filed separate objections, to which demurrers were sustained, the objections stricken, and the final report approved. This appeal followed.

We are met at the outset of the case with a motion to dismiss the appeal. This motion was heard on motion day and passed to the merits. It is made on two grounds: First, that the transcript of record on appeal and appellants' brief were not filed within the time prescribed by the rules of the court.

The transcript and brief were on file before the motion to dismiss was filed, and, as the matter is not jurisdictional and since it does not appear that any prejudice to respondent has resulted from the delay, the motion to dismiss on that ground will be denied.

The second ground is to the effect that it appears on the face of the record that the two appellants had no standing in law to file objections to the report. This is also the respondent's major contention on the merits.

The opinion in *National Bank of Commerce v. Peterson, supra,* also recites:

"On September 23, 1931, the judge then sitting as probate judge made an order allowing the attorney for the administrator a fee of twenty-five thousand dollars in addition to an allowance of one thousand dollars made when the administrator's first report was ap-

proved, and allowed a like sum to L. A. Peterson, as administrator of the estate. This hearing was *ex parte,* and both the administrator and his attorney knew that the state inheritance tax had not been adjudged and paid. The administrator paid the Federal inheritance tax several years ago, but has never completed his report to the state inheritance tax department. All other steps in the administration of the estate were practically completed in 1929 or 1930."

L. A. Peterson received $26,300 as administrator's fees and, as the court remarked in the *National Bank of Commerce* opinion, seems to have managed the estate as if he were the sole owner, or, at least, under a nonintervention will giving him sole authority. After so managing the estate for thirteen years, he died in October, 1937, and C. A. J. Taylor, the present administrator, was appointed. He recites in his official report:

"That all monies received by said administrator [L. A. Peterson] and not expended by him for said estate as above-mentioned, amounting to the sum of $68,102.32, were used by him in his life time; that at the time the said C. A. J. Taylor was appointed as said administrator *de bonis non* of said estate the only property remaining therein was a small amount of furniture and fixtures of very little value, subject to four years' taxes; that he filed herein a petition for the sale of said property; that on the 16th day of June, 1936, this court ordered the same to be sold and, although he has made diligent effort to do so, he has not been able to get any offer for it over and above enough to pay said taxes; that his attorney, James C. McKnight, has offered to take it, subject to said taxes, in payment of the costs advanced and to be advanced by him for said estate and he recommends that his offer be accepted."

The income from the corpus of the estate is thus accounted for. What became of the corpus itself?

The inventory shows the personal property of the estate and the appraisal as follows:

| | | |
|---|---|---|
| (1) | "Household Articles | $    500.00 |
| (2) | "One Cadillac Automobile | 1,000.00 |
| (3) | "One Watch, one Ladies Dinner Ring, set with small diamonds and one small Gold Ring and other small articles of Jewelry | 200.00 |
| (4) | "One Gold Ring, set with a large Diamond, one Tie Pin, set with large Diamond, two Shirt Studs, each set with a small Diamond and one Gold Ring, set with small Diamond, | 1,400.00 |
| (5) | "Cash on Deposit in Seattle National Bank and | 5,225.27 |
| | "Cash on person of decedent at death and | 54.00 |
| | "Cash refunded from United States for mistake in Income Tax | 125.00 |
| (6) | "Seventy Shares of Stock in the Lion Oyster House Company, a corporation of Seattle, Washington, par value $100.00 each, or a total par value of $7,000.00 | 7,000.00 |
| (7) | "Balance of Note due decedent from Geo. W. Miller and Lottie O. Miller, secured by a mortgage on Lot Two (2) in Block One (1) of H. L. Yesler's 1st Addition to Seattle, King County, Washington, amounting to $2007.78 at the death of said decedent, | 2,007.78 |
| (8) | "Ten Shares of Stock in the Community Hotel Corporation, a corporation, of Seattle, Washington, of the par value of Ten Dollars each, or a total par value of $100.00 | 1,000.00 |
| (9) | "One Second Mortgage Sinking Fund Seven per cent Gold Bond of the Community Hotel Corporation of Seattle, Washington, No. a. M. 1268, for $1,000.00 | |
| (10) | "The Cave Mine in the State of Idaho, located in Custer County on Bay Horse Creek, which may have reverted to the Government for want of assessment work, | 000.00 |
| | Total, | $18,512.05" |

The personal property was disposed of in the following manner: Item 1, or household articles, went to Mr. McKnight to reimburse him for some costs. The Cadillac automobile was worn out by the administrator and sold as junk. The jewelry, listed as items 3 and 4, was, for the most part, sold to Mr. McKnight, and the purchase price credited on his attorney's fee, as will be hereinafter noted. The cash (item 5) was used

by the administrator. The stock in the Lion Oyster House Company (item 6) ultimately proved to be of no value. With respect to the Miller note, the administrator received $2,191.46. The bond and stock of the Community Hotel Corporation (items 8 and 9) were sold for some unknown sum by the administrator and the proceeds personally used by him, and the Cave Mine (item 10) proved to be of no value. All of the data in this paragraph is taken from the final report and the decree approving it.

The bulk of the estate consisted of the following real property. For the sake of brevity, we will, as far as is possible, omit legal descriptions:

| | | |
|---|---|---:|
| (1) | The Cápitola Apartments, appraised at | $ 65,000.00 |
| (2) | The Ingomar Apartments, appraised at | 35,000.00 |
| (3) | The Bellevue Apartments, appraised at | 45,000.00 |
| (4) | The Bristol Apartments, appraised at | 45,000.00 |
| (5) | Part of Lot 2, Block 62, Denny's Addition | 14,000.00 |
| (6) | Part of Lot 3, Block 62, Denny's Addition | 10,000.00 |
| (7) | Three lots in Denny-Fuhrman's Addition | 7,000.00 |
| (8) | Lot in Pontius Addition | 3,500.00 |
| | Total, | $224,500.00 |

At the time of Lars Peterson's death, there was mortgage and contract indebtedness against this real property in the sum of $63,028.36.

It is clear from the record that the theory that, since the administrator was the sole heir, he was, therefore, at liberty to manage the estate as if he were the sole owner, a theory upon which the respondent still strongly insists, led to the dissipation of the property of this estate. Mr. McKnight was allowed, as attorney's fees, three hundred dollars in October, 1924, one thousand dollars in June, 1925, and twenty-five thousand dollars in December, 1931; yet no attempt seems to have been made to pay—or collect—any part of these fees until June, 1935. At that time, the administrator began petitioning the court for permission to sell off the income-producing property to pay the following items of administration costs: Two thousand

dollars inheritance tax due the state of Washington; four thousand dollars of unpaid taxes against the Denny Fifth Addition property; and the $26,300 attorney's fees due Mr. McKnight. The income-producing properties were sold during that year for the purposes indicated. That would not have been necessary had the costs of administration been paid when they should have been paid and when there was money to pay them. In the ten or eleven years involved, Peterson not only received $26,300 as administrator's fees, but withdrew $68,102.32 of the income from the estate for his personal use. Between the time the administrator received the four apartment houses in 1924 and their sale in 1935, the income received from them was large. We quote from paragraph 14 of the decree appealed from:

"That therefore the net amount of said rentals after deducting said sums so paid out for said commissions and management fees was the sum of $287,151.20."

The court granted the petition to sell the Capitola apartment property in June, 1935. The time of notice of sale was shortened to ten days. This property had been appraised in 1925 at sixty-five thousand dollars. During his possession of the property, the administrator received $96,794.99 rentals therefrom. It was re-appraised at twenty-five thousand dollars, and was sold to Moses Toivonen for twenty-six thousand dollars, he assuming, as part of the purchase price, a mortgage for fifteen thousand dollars. Of the eleven thousand dollars cash received, five thousand dollars was paid to McKnight.

A little later, the other three apartment houses and the property in the Denny addition were sold to McKnight. But, in order to understand this transaction, it is necessary to go back to the case mentioned

at the beginning of this opinion, *National Bank of Commerce v. Peterson,* 179 Wash. 638, 38 P. (2d) 361.

In February, 1925, L. A. Peterson, the administrator of the estate of Lars Peterson, had personally borrowed from the bank five thousand dollars, securing the note by warranty deed in which he declared himself the sole heir of Lars Peterson, and in which he conveyed the two parcels of land in Denny addition (items 5 and 6 of the real estate hereinbefore listed).

In September, 1925, Peterson and one Wade borrowed six thousand dollars from the bank, giving a note therefor. The bank recovered against Peterson on both notes. The deed was declared to be a mortgage, but the judgment provided that Peterson might maintain possession of the real property until the estate should be closed. The deed further provided that the interest of Peterson as heir at law, subject to the right of the administrator and the state of Washington, should be sold, and the proceeds applied in satisfaction of the bank's judgment. The decision was affirmed by this court, whereupon, says the final report and petition for distribution:

"That after the rendition of its decision by said Supreme Court said National Bank of Commerce caused a special execution and order of sale to be issued out of this court for the sale of said East half of Lot Two and said North Half of Lot Three, Block 62 of A. A. Denny's Fifth Addition to the City of Seattle, King County, Washington, based upon its said judgment upon said first note, commanding the sheriff of said King county to sell said property according to law and to apply the proceeds of said sale to the satisfaction of said portion of said judgment, with interest and costs of suit; that said sheriff duly levied on said property and duly sold the same on the 2nd day of February, 1935, to the said National Bank of Commerce for the sum of $4,000.00, and on that day duly executed and delivered to the said National Bank of Commerce

his certificate of purchase on order of sale of said property, which said certificate of purchase was duly filed in the auditor's office of said King county and is of record therein in Volume 1624 of Deeds, page 224; that said National Bank of Commerce also caused an execution to be issued out of this court for the sale of [Here follows technical legal descriptions of the Ingomar, Bristol, and Bellevue apartment properties], based upon its said judgment upon said second note, commanding said sheriff to sell said property according to law and to apply the proceeds of said sale to the satisfaction of said judgment, with interest and costs of suit; that said sheriff duly levied upon said property and duly sold the same on the 16th day of March, 1935, to the said National Bank of Commerce for the sum of $5,500.00, and on that day duly executed and delivered to said National Bank of Commerce his certificate of purchase on execution of all of said property, which said certificate of purchase was duly filed in the auditor's office of said King county and is of record therein in Volume 1636 of Deeds, page 225; that thereafter and on the 5th day of December, 1935, the said National Bank of Commerce, by its written and duly acknowledged assignment assigned, transferred and set over to the said James C. McKnight each of said certificates of purchase and quit claimed and conveyed to him all of its right, title and interest in and to the properties above and therein described and assigned, transferred and set over to the said James C. McKnight all of its right, title and interest in and to the unpaid portions of its above-mentioned judgment as rendered by this court and affirmed by said supreme court; that the said James C. McKnight is still the owner and holder of said certificates of purchase and of said unpaid portions of said judgment; and that no part of said property was ever redeemed from said sale and the time for redemption has long since passed and the said L. A. Peterson had no interest whatever in said property at the time of his death."

On the 12th day of December, one week after Mr. McKnight had acquired the National Bank of

Commerce judgment and the certificates of purchase, as related in the preceding paragraph, L. A. Peterson petitioned the court for leave to sell the Park apartments (formerly called the Ingomar), the Bristol apartments, and the Bellevue apartments, and the two fractional lots in the Denny addition. The petition represented that the fees of Mr. McKnight had been allowed at $26,300, of which no part had been paid, except five thousand dollars and sale and delivery to him of the jewelry (items 3 and 4 personal property list), which was appraised at sixteen hundred dollars, for the sum of five hundred dollars, which he had applied upon his fee, leaving a balance of $20,800, besides interest due thereon.

The original aggregate appraised value of the four properties included in this petition was one hundred and forty-nine thousand dollars. It is shown in the final report that the rentals received, over the period when these properties were in possession of the administrator, amounted to an excess of one hundred and fifty-nine thousand dollars.

An order of sale was issued on the day the petition was filed, directing the administrator to sell the property at private sale to the highest and best bidder, either in bulk or by separate tracts, and either subject to encumbrances or for a sum or sums sufficient to pay said encumbrances and to leave a margin to pay on the expenses of administration. It was further ordered that Mr. McKnight might become the purchaser of the property, and, in that event, his said indebtedness against the estate should be deemed the equivalent of cash; and it was further ordered that the time of the notice of sale be shortened to ten days, and that the sale might be made within fifteen days. It appears from the return that notice was published in the Duwamish Valley News and posted in three public

places; that bids were received at the office of Mr. Mc-Knight, or might be filed in the office of the clerk of the court or delivered to said administrator at his residence.

The only bid received was from Mr. McKnight, who offered to pay ten thousand dollars over and above the encumbrances on the four properties, which were $45,468.09. The sale was confirmed on January 10, 1936, and Mr. McKnight credited a ten thousand dollar payment on his attorney's fees, reducing his claim to $10,800.

In the meantime, the lots in the Denny-Fuhrman and Pontius additions (items 7 and 8 of the real estate hereinbefore listed) were lost by foreclosure, and, so, after the bulk of the property of the estate passed into the ownership of Mr. McKnight in January, 1936, nothing was left in the estate but a few odds and ends. Nothing was done, however, toward settling the estate.

A year and nine months passed by, and L. A. Peterson died in October, 1937. Upon a showing that there were unadministered assets of the estate of Lars Peterson of a value of five hundred dollars, C. A. J. Taylor, a half-brother of L. A. Peterson and allegedly an employee of Mr. McKnight, was appointed administrator *de bonis non*, and, as such, filed the final report on November 1, 1938.

The matters relating to the purchase of the properties by the administrator's attorney, Mr. McKnight, are set forth in paragraphs 19, 20, 21, 22, and 24 of the report. The objections filed by Neola Taylor Higgins are quite similar to those filed by Mina B. Quillin, and, in part, read as follows:

"(6) Objects to all of the matter set forth in Par. XIX because the same was and shows on its face to be that the acts set forth therein were a fraud on the estate and the court for the purpose of defrauding the estate out of the property described therein and alleges

that when the said James McKnight took the assignment of the said certificate of purchase he was acting in a fiduciary relation to the estate and that he now holds the said property and any interest he has therein in trust and as trustee for the estate.

"(7) Objects to the matter set forth in Par. XX because same was a fraud perpetrated on the estate by the said attorney, that there was no sum due the attorney from the estate, that the estate received nothing and that the said attorney James McKnight received and holds the said property in trust and as trustee for the estate.

"(8) Objects *at* all matter set forth in Par. XXI and XXII because it was and shows on its face it was a fraud on the estate and the court for the purpose of defrauding the estate out of the property described therein, that the estate is not and never has been indebted to the said attorney, that the price purported to have been paid for the property was grossly inadequate and that the re-appraisement was made in furtherance of said fraud and was not a fair or true appraisement of the said property or the *of the* value thereof.

"(9) Objects to all the matters set forth in Par. XXIV because it was and shows on its face it was a fraud on the estate and the court for the purpose of defrauding the estate out of the property described therein, that the estate is not and never was indebted to the said attorney, that the price purported to have been paid for the property was grossly inadequate and that she alleges that the said attorney James McKnight was acting in a fiduciary relation to the estate and holds the said property described in Paragraphs XXI, XXII and XXIV as trustee and in trust for the estate."

We are not specifically advised of the ground upon which the lower court sustained the demurrers, but, from the argument made by the respondent on appeal, we infer that it did so upon the ground that the appellants had no standing to object to the acts of L. A. Peterson in disposing of the property of the estate, since he was its sole owner.

Mina B. Quillin is the assignee of Chandos Garner. It appears that, in October, 1935, Garner, having a judgment against L. A. Peterson, the sole heir of Lars Peterson, secured the following order in supplementary proceedings:

"IT IS HEREBY ORDERED AND ADJUDGED: That on the final or any partial distribution of the estate of Lars Peterson, deceased, in cause No. 35,805 of this court, any and all money and any and all interest in any and all personal or real property distributed to L. A. Peterson, the defendant herein, shall immediately on such distribution and without delivery to the defendant L. A. Peterson in his personal capacity, be delivered to the Sheriff of King County, Washington, to be by him applied on the judgment herein or sold in the manner provided by law on execution and the proceeds applied to the satisfaction of the judgment herein as far as may be.

"AND FURTHER that the defendant L. A. Peterson be and he is hereby restrained and enjoined from transferring, encumbering, selling or in any manner dealing in or affecting any of his interest in said estate of Lars Peterson, deceased, prior to its final distribution, without the written consent of the plaintiff herein.

"AND FURTHER that this order shall not affect the orderly administration of the said estate but that the said L. A. Peterson as Administrator shall give to the plaintiff's attorney notice of the filing of his final account."

On December 19, 1935, about a week before the sale of the bulk of the estate's assets was made to Mr. McKnight, Garner petitioned for the removal of L. A. Peterson as administrator, and, in the event that he be not removed, that he be ordered to forthwith file his final account, and that he be restrained from distributing to himself personally any of the funds of the estate. The petition also prayed for the setting aside of certain orders already made. To this petition, the administrator demurred; and, after a hearing before

one of the judges of the superior court, the demurrer was sustained and the petition dismissed, with prejudice.

It is argued that, since no appeal was taken from the order of dismissal, the question as to whether or not Garner had any interest in the Lars Peterson estate became *res judicata.* But Garner derived whatever right he had to petition from the order above quoted, which recites:

"AND FURTHER that this order shall not affect the orderly administration of the said estate but that the said L. A. Peterson as Administrator shall give to the plaintiff's attorney notice of the filing of his final account."

It would seem that a holding that Garner could not, under this order, interfere with, or control, the course of administration, is not an adjudication that he, or, rather, his assignee, cannot question the final account, when made. That is the question which this case presents.

In the *National Bank of Commerce* case, which has been so often referred to throughout this opinion, it was recognized that the deed given by L. A. Peterson conveyed his interest "as heir at law" in the property granted, but it was ordered that the bank should not interfere with the ordinary administration of the estate of Lars Peterson. It was added:

" 'This decree to be without prejudice to the right of plaintiff, if any, to require an accounting of the administration.' " *National Bank of Commerce v. Peterson,* 179 Wash. 638, 641.

We think that the order made in the supplementary proceedings, though not so specific, was made with the same intent. Garner was not to interfere with the ordinary administration of the estate, but he was to have notice of the filing of the final account. His in-

terest in the account thus seems to be recognized. Suppose the report and petition for distribution had revealed property in the hands of C. A. J. Taylor which would normally go, by right of inheritance, to L. A. Peterson, and, he being dead, it was proposed to distribute it to his heirs. Clearly, Garner would have standing to object to any such distribution being made until his judgment was satisfied. Has he not equal standing to offer an objection to the effect that, if the account were lawfully made, it would show that there is property distributable to the Peterson heirs?

█ It is strongly contended that Neola Taylor Higgins has no standing to object to the final report. It is pointed out that she is not an heir of Lars Peterson, but merely the heir of L. A. Peterson, the sole heir of Lars Peterson, and it is said that there is, therefore, no privity and no interest. We reject this contention on the authority of *In re Bradley's Estate,* 184 Wash. 642, 52 P. (2d) 333, which appears to be directly in point. E. J. Bradley died, leaving his wife, his sole heir and sole beneficiary under his will, as executrix. She died before her husband's estate was closed, leaving Eleanor Gale, her niece and her next of kin, a small legacy. An administrator *de bonis non* was appointed to complete the administration of E. J. Bradley's estate. Eleanor Gale appeared and objected to his final report in that estate, with particular reference to the proposed allowance of attorney's fees. The report was approved, and she appealed. It was contended that she had no interest in the E. J. Bradley estate, and, therefore, no standing to object or appeal. The action of the lower court was reversed and her objections sustained, the court saying, in part:

· "She is an interested party, *whether treated as a next of kin* or as a legatee under the will of Mrs. Bradley, to whose estate the property is distributed." (Italics ours.)

Much of the respondent's brief goes to the merits of the matter. It is said (1) that the final report was examined and approved by a judge who was familiar with the entire history of the administration; and (2) that the matters and things objected to are all fortified and buttressed by interlocutory orders which must be regarded as *res judicata*. These orders are brought up by supplemental transcript for our inspection.

The matter having gone off on demurrer, the merits are not before us. Moreover, if they were, we do not have a complete record of the administration. From such portions as have been brought up, we note, however, that at least five different superior court judges have made orders in the cause, and some of them appear to have been made in a rather perfunctory manner. For example, it appears from the record that the order authorizing the sale of the bulk of the property of the estate to pay the fees of the attorney for the estate was made *ex parte*. The petition was verified on September 12, 1935, filed on September 12, 1935, and the order entered on December 12, 1935. The order was signed by a judge who, as far as the record shows, had not theretofore signed orders in the administration of the estate. The order provided that the three apartment houses and two other improved fractional lots should be sold to pay the attorney's fees; that the time for notice should be shortened to ten days; that the attorney might become a purchaser of any or all of the property; and that, in case of purchase, he might use his claim against the estate as the equivalent of cash. There seems to be some authority to the effect that such a sale should be set aside as against public policy. 24 C. J. 639, § 1598.

Questions as to the binding effect of the various interim orders will, in the first instance, be for the

determination of the trial court, to which this cause will be remanded. But, under a system where orders in probate of such importance may be presented for signature to any one of fifteen judges who may happen to be available at the time, it is hoped that it may be found that the law does not prevent their being inquired into by the judge who was called upon to pass upon the final reports, especially when a charge of fraud is made against the attorney who procured their entry.

It is also urged, as a reason for sustaining the demurrers, that the charges of fraud are too general; that only conclusions of law are pleaded, and no facts. But it is alleged that the attorney came out of a transaction with his client with the bulk of his client's property, and, as one of the means to that end, he purchased judgments against his client while serving as his attorney. These are allegations of fact, and they would seem to be sufficient to put the attorney to his proof under the very strict rules which govern the relationship between attorney and client.

"So strict is the rule on this subject that dealings between an attorney and his client are held, as against the attorney, to be prima facie fraudulent, and to sustain a transaction of advantage to himself with his client the attorney has the burden of showing not only that he used no undue influence, but that he gave his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been had the client dealt with a stranger." 6 C. J. 686, § 211; 7 C. J. S., Attorney and Client, § 127.

Finally, nothing said in this opinion should be taken as an indication of the court's attitude as to the merits of the objections. In fact, so far as we know, there may even be an acceptable explanation for the seemingly

unconscionable delay in settling this estate. We decide only (1) that the appellants had sufficient interest to file objections to the final report; and (2) that the objections were good as against general demurrers.

The decree approving the final report of the administrator is reversed. The orders sustaining the demurrers to the objections and the orders striking the objections of each of the appellants are set aside and the cause will be remanded to the superior court of King county, with a direction to pass upon the respondent's motions to require the objections to be made more definite and certain.

BLAKE, C. J., MAIN, MILLARD, and SIMPSON, JJ., concur.

[1]Reported in 107 P. (2d) 588.