[No. 49402-9. En Banc. July 28, 1983.]

*In the Matter of the Guardianship of*
CORA ADAMEC.

*Kleist & Davis, Inc., P.S.,* by *Donald K. Davis,* for appellant.

*Eldon W. Anderson,* pro se.

*Bogle & Gates,* by *E. McDuff Archibald,* for respondent.

*John Ranquet,* as administrator.

PEARSON, J.—The personal representative of Cora Adamec and Shriners' Hospitals for Crippled Children, Inc., appeal the dismissal of their CR 60(b) motion to vacate an order confirming a sale of real property.

At the center of the dispute before us is the sale of a piece of real property by a client to her attorney. The sale was subsequently confirmed by the Superior Court in guardianship proceedings initiated by the attorney. The order of confirmation was entered after the court had appointed a guardian ad litem to investigate the transaction, and after the guardian ad litem reported to the court that the attorney had paid a reasonable price for the property. The issue before us is whether this order of confirmation should be vacated upon timely motion under CR 60(b). We hold that no grounds for vacation of the motion have been established, and accordingly we affirm the trial court.

Appellants in this joint appeal are Eldon Anderson, administrator de bonis non with will annexed for the Estate of Cora Adamec (Administrator), and the Shriners' Hospitals for Crippled Children (Shriners), principal beneficiary under the will of Cora Adamec. Respondent is a Seattle attorney, H. Joel Watkins.

In December 1976, Cora Adamec sold to her attorney, Watkins, a houseboat moorage on Lake Union. In March 1980, this sale was confirmed by an order of the Superior Court. This order of confirmation was challenged by Shriners and the Administrator, who in January 1981 jointly moved the court to vacate the order of confirmation. The court denied the motion and Shriners and the Administrator appealed. Watkins has cross–appealed from the trial court's denial of appraisal fees incurred in responding to the motion of the Shriners and the Administrator.

Watkins was for many years both attorney for and close friend of Mr. and Mrs. Adamec. He met Joseph Adamec in 1940 when both were employed by the Alaska Steamship Company on the SS *Columbian*. Watkins left his employment with the steamship company to study law and in 1949 was admitted to practice in this state. He met Mrs. Adamec in 1949 when he began to perform legal services for the Adamecs. Over the ensuing years, Watkins intermittently performed a variety of legal services for Adamecs, and a close friendship developed between Watkins and the Adamecs.

The Adamecs lived for many years on the Lake Union moorage property, which comprised 120 feet of lakefront and three houseboats. They derived income from renting the houses and moorage sites on the property.

In May 1973, Joseph Adamec died. Subsequently, Watkins drafted a new will for Mrs. Adamec, in which she named Watkins her executor. The primary beneficiaries of this will were the Shriners. In October 1974, Mrs. Adamec executed a durable power of attorney (pursuant to RCW 11.94.010) which designated Watkins as her attorney in fact, with power to act on her behalf if she subsequently

became disabled or incompetent.

In December 1976, Mrs. Adamec was hospitalized for treatment of an infection of one of her toes. On December 30, 1976, while in the hospital, she executed a contract for the sale to Watkins of real property, a leasehold interest, and other personal property. Under this contract, Watkins agreed to purchase the Lake Union waterfront for $70,000; a floating moorage and storage shed for $1,500; and a floating home for $5,700. The contract also granted an option to purchase either or both of two floating homes moored at the property. The contract reserved for Mrs. Adamec a limited estate in the property for so long as she should "maintain or occupy [the property] as her principal and sole residence". She was entitled to all profits from the property for the duration of her limited interest.

Pursuant to the contract, Watkins made a $500 down payment on the property. The balance of the purchase price was to be paid as follows: $200 a month for the duration of Mrs. Adamec's limited interest and, when that limited interest terminated, a balloon payment of $5,000 and monthly payments of $600.

On January 4, 1977, Mrs. Adamec signed a statutory warranty deed which, pursuant to the real estate contract, was to be held in escrow pending payment in full of the purchase price. According to Watkins, this contract was the culmination of Mrs. Adamec's plan, developed over 2 years, to provide herself with security in her declining years and relieve her from the burden of managing the property. Watkins participated in the transaction in his capacity as her friend and pursuant to her specific wishes.

Following her hospitalization in December 1976, Mrs. Adamec's physical condition deteriorated. She returned briefly to the moorage property in January 1977, after the infection in her toe was eliminated. She was, however, hospitalized once again in February 1977, suffering from depression, and was subsequently transferred to a convalescent home. Watkins at this time exercised the powers pursuant to the durable power of attorney executed in

October 1974, and authorized some modifications to the moorage property.

Mrs. Adamec never returned to the moorage property. In May 1978, she underwent a mastectomy from which she failed to recover. It now became apparent to Watkins that Mrs. Adamec would never be well enough to return to her moorage property. He made arrangements to refurbish her residence and place it on the rental market, intending thereby to increase Mrs. Adamec's income from her property. The cost of the improvements in 1978 exceeded $8,000. In the fall of 1978, however, the Department of Natural Resources increased the annual rent on the lake bed from $900 to $3,024. Watkins attempted to recoup these increased costs by increasing the rent charged moorage tenants on the property; he was, however, unsuccessful because local regulations limited such increases.

In December 1978, Watkins formalized a partnership, J & D Investments, with David D. Webber. Webber was Watkins' law partner in the firm of Watkins & Webber. The moorage property was conveyed by Watkins to J & D Investments by statutory warranty deed dated January 1, 1979. On December 29, 1978, J & D Investments paid $75,000 into Mrs. Adamec's account, fulfilling all outstanding obligations under the December 30, 1976, contract. Of this amount, $5,900 was for the purchase of one of the houseboats, in exercise of the option. An additional $1,890 was paid on May 5, 1979. (This latter payment apparently reflected a typographical error in the contract of sale: the parties had agreed orally that the purchase price of the houseboat was to be the appraised value of $7,590, not $5,700, as specified in the contract, and $1,890 represented the difference.) Watkins had paid $8,600 under the contract prior to December 1979. Total payments to Mrs. Adamec therefore amounted to $85,490.

In July 1979, Watkins was informed by the Washington State Bar Association that a complaint had been registered regarding the sale of the moorage property. The complaint made by a tenant of the moorage property was investigated

by the Disciplinary Board of the bar association.

While this investigation was under way, Watkins, on November 29, 1979, petitioned for his own appointment as guardian of Mrs. Adamec, for approval of his account to date as Mrs. Adamec's attorney in fact, and for confirmation of the sale to him of the moorage property. The petition alleged that Watkins was inhibited in the exercise of his power of attorney by unjustified claims and accusations of "unrelated persons". The court responded to this petition the following day by appointing an experienced Seattle attorney, Robert Beezer, guardian ad litem to represent Mrs. Adamec's interests. Beezer was directed to consult with Mrs. Adamec and explain to her the nature of the proceedings, to provide the court with a written report, and to arrange for a written medical report pursuant to RCW 11.88.045.

On December 10, 1979, Beezer submitted his first report to the court. In this report he indicated that he had consulted with Mrs. Adamec and found her extremely confused. He recommended that Watkins be appointed guardian of the person and estate of Mrs. Adamec. Beezer also provided a statement from Mrs. Adamec's longtime personal physician to the effect that Mrs. Adamec's condition had gradually deteriorated since her mastectomy. The deterioration was the result of her advanced age (she was born in 1901) and general arteriosclerosis. Mrs. Adamec was completely confused and disoriented, and her prognosis was poor.

On December 11, 1979, the court authorized Beezer to appoint an MAI appraiser (member of the American Institute of Real Estate Appraisers) to evaluate the property sold by Mrs. Adamec to Watkins, and directed Beezer to submit a further report. On the same day, the court appointed Watkins guardian of Mrs. Adamec.

Beezer obtained a "preliminary value estimate" of the property from Michael McCrackin, an MAI appraiser. McCrackin estimated the property was worth, as of December 1976, between $80,000 and $100,000. McCrackin

stressed in his letter that this estimate did not represent an appraisal and that "because of the unusualness of the property and the difficulty of the appraisal problem an in-depth appraisal may change the valuation found in this preliminary report". McCrackin's appraisal did not take into account the value of Mrs. Adamec's limited life estate in the property. (Subsequently, McCrackin formally appraised the property—again without considering the life estate—as having a fair market value of $90,000 on December 30, 1976.) Beezer, in his second report (March 24, 1980) made a recommendation, based on McCrackin's letter, that the price paid by Watkins was reasonable and that there was no need to appoint an independent attorney to commence an action to set aside the sale.

The court accepted Beezer's recommendations, and on March 28, 1980, ordered that the transaction of December 1976 was "a valid contract of sale and purchase for a reasonable consideration and the same be and is hereby confirmed". The court also concluded that Watkins' account of his actions while acting as attorney in fact pursuant to RCW 11.94 was complete and accurate.

Meanwhile, on January 31, 1980, the bar association informed Watkins that its investigation had revealed no misconduct on his part in respect of the transaction and accordingly the complaint had been dismissed.

Mrs. Adamec died on October 3, 1980, and Watkins was confirmed as her personal representative on October 7, 1980. Subsequently, on November 12, 1980, Watkins, upon petition of the Shriners for his removal and the appointment of a nominee of Shriners as administrator de bonis non, voluntarily withdrew as executor, and the present administrator was appointed.

On October 29, 1980, the Shriners had filed a lawsuit in King County Superior Court. The Shriners sought to have the December 1976 transaction set aside, and requested a declaration that the subject property was held in a constructive trust. They alleged that Mrs. Adamec was incompetent at the time of the transaction, that the transaction

was the result of a consistent pattern of fraud by Watkins, that the transaction was the result of undue influence by Watkins, and that the transaction represented a breach of Watkins' fiduciary duty to Mrs. Adamec.

Watkins' motion to dismiss the complaint was filed on January 20, 1981. The Shriners responded with a motion to consolidate the action with the guardianship proceedings initiated in 1979. The court, on January 30, 1981, denied the motion to consolidate and granted Watkins' motion to dismiss with prejudice the Shriners' complaint. This decision was not appealed.

Meanwhile, the Shriners and the Administrator had commenced a parallel proceeding in the guardianship of Mrs. Adamec. On January 22, 1981, they jointly moved for vacation of the order confirming the sale from Mrs. Adamec to Watkins. The motion was based on CR 60(b). It was denied on March 2, 1981, on the grounds that there was no evidence that the order confirming the sale was obtained by fraud, and that the trial court had authority to enter the order. On March 27, 1981, the trial court awarded Watkins $7,015 in attorney fees, but denied an award to him of $2,500, representing appraisal fees incurred in responding to the motion of the Shriners and the Administrator.

The Shriners and the Administrator appealed the denial of their motion of January 22, 1981, and the Court of Appeals certified the matter to this court.

We turn now to consider the trial court's order of March 2, 1981, dismissing the motion of the Shriners and the Administrator to vacate under CR 60(b) the order confirming the sale. The standard of review which we follow in such a case is manifest abuse of discretion.

> A motion to vacate a judgment is to be considered and decided by the trial court in the exercise of its discretion, and its decision should not be overturned on appeal unless it plainly appears that this discretion has been abused.

*Martin v. Pickering,* 85 Wn.2d 241, 245, 533 P.2d 380 (1975).

We conclude that the record does not plainly indicate that the trial court abused its discretion in denying the motion to vacate the order confirming the sale. We accordingly affirm the denial of the motion.

Under CR 60(b), an order may be vacated on any of 11 grounds. Appellants assert that any 5 of these grounds justify vacation of the order of confirmation in the present case. We consider these in turn.

CR 60(b)(1) provides that the court may relieve a party or his personal representative from a final judgment or order for "irregularities" in obtaining the judgment or order. Irregularities which can be considered on a motion to vacate a judgment are those relating to want of adherence to some prescribed rule or mode of proceeding. *State v. Price*, 59 Wn.2d 788, 791, 370 P.2d 979 (1962). Appellants argue that such irregularities occurred in this case, where a sale of realty was confirmed in the course of proceedings to appoint a guardian. Appellants' argument is that none of the guardianship statutes authorizes the court to confirm a sale of realty which occurred 3 years prior to the commencement of the guardianship proceedings. Because it is not based upon any specific statutory authority, appellants argue, the order was obtained irregularly and should therefore be vacated.

This argument ignores the fact that the trial court, sitting in a guardianship proceeding, is not limited to the particular powers enumerated in the statutes specifically governing guardianship proceedings. The broad power and authority of a court sitting in probate is codified in RCW 11.02.020.

> It is the intention of this title that the courts mentioned shall have full and ample power and authority to administer and settle all estates of decedents and incompetent persons in this title mentioned. If the provisions of this title with reference to the administration and settlement of such estates should in any cases and under any circumstances be inapplicable or insufficient or doubtful, the court shall nevertheless have full power and authority to proceed with such administration and set-

tlement in any manner and way which to the court seems right and proper, all to the end that such estates may be by the court administered upon and settled.

This provision recognizes what has long been held by this court, that a court in a probate matter has all of the powers available to a court of general jurisdiction.

> In this state we have no probate court, properly speaking, as distinguished from the court that entertains jurisdiction of other matters. The court of general jurisdiction also hears and determines probate matters. Matters pertaining to probate are referred to what is called "probate procedure," as distinguished from what is denominated "civil" or "criminal procedure." But when the court, sitting in a probate proceeding, discovers in a petition the statement of facts which forms the basis of a controversy, we see no reason why it may not settle the issues thereunder when an appearance has been made thereto, and then proceed to try it in a proper manner, as any other civil cause.

*Filley v. Murphy,* 30 Wash. 1, 5, 70 P. 107 (1902). The general powers of the court in probate matters were reaffirmed in another decision of this court a few years after *Filley v. Murphy.*

> The constitution simply throws probate matters into the aggregate jurisdiction of superior courts as courts of general jurisdiction, to be exercised along with their other jurisdictional powers, legal and equitable, and as a part of those general powers. . . .
>
> "When a superior court has presented to it through a petition, in any matter of probate, any issue touching the estate, it has jurisdiction both of the parties and of the subject–matter, and it deals with them not as a court of limited, but of general, jurisdiction. It may exercise all of its powers, legal or equitable, and may even invoke the aid of a jury to finally determine the controversy.

*In re Estate of Martin,* 82 Wash. 226, 233, 144 P. 42 (1914) (quoting *State ex rel. Keasal v. Superior Court,* 76 Wash. 291, 298–99, 136 P. 147 (1913)).

The existence of a statute authorizing the court to appoint a guardian does not deprive the court of those broad powers which comprise its general jurisdiction. *In re*

*Sall,* 59 Wash. 539, 543, 110 P. 32 (1910). Accordingly, the trial court in entering the order confirming the sale was not confined to the powers and procedures specified in the guardianship statutes.

In the exercise of these general powers in guardianship proceedings, the court has authority to inquire into transactions which occurred prior to the guardianship. A graphic illustration of the exercise of such authority is the case of *In re Williamson,* 75 Wash. 353, 134 P. 1066 (1913). In that case, a physician, Mrs. Hazzard, whose usual course of treatment was to prescribe fasting, gained ascendancy over one of her patients, Miss Williamson, and "came into control of her business affairs and personal conduct". 75 Wash. at 354. Mrs. Hazzard obtained from Miss Williamson sums of money totaling $1,324. She subsequently obtained an order appointing her guardian of Miss Williamson. This order was subsequently set aside, and Mrs. Hazzard was required to account to the court for the sums acquired prior to the guardianship. The court held that there was a balance of $856 due from Mrs. Hazzard to Miss Williamson (the court having made an allowance for reasonable treatment rendered to Miss Williamson). This court upheld the trial court's disposition of the matter, concluding that "the learned trial court had jurisdiction to compel Mrs. Hazzard to account for all sums she had received prior to the guardianship". 75 Wash. at 359.

In a more recent case, this court suggested that the court in a guardianship proceeding should satisfy itself of the propriety of transactions occurring prior to the formal appointment of a guardian. *In re Spiecker,* 69 Wn.2d 32, 416 P.2d 465 (1966). In that case, the ward, 3 years before being declared incompetent, withdrew a substantial sum from his bank. His constant companion during those years, his niece, was appointed his guardian. This court affirmed the trial court's denial of a petition to remove the guardian, but said:

> [W]e are frankly concerned with a number of circumstances that do not seem to us to have been satisfactorily

explained in the light of the apparent questionable competency of [the ward] to handle large sums of money for some time prior to the adjudication of incompetency.

On the hearing of the intermediate account, the superior court might well have availed itself of the authority given it by RCW 11.92.050 to have a guardian ad litem appointed to represent the incompetent. An independent investigation might have been of great assistance to the superior court and have resolved some of the matters that concern this court.

69 Wn.2d at 34.

The clear import of *Williamson* and *Spiecker* is that the court may set aside improper transactions between the guardian and ward which occurred prior to the appointment of the guardian. The necessary corollary of this approach is that the court may confirm transactions occurring prior to the guardianship if it concludes on reasonable grounds that the transactions are not improper.

In the present case, therefore, the court had the power, and possibly the duty, to inquire into the transactions between the guardian and ward which took place prior to the appointment of the guardian. The disputed transaction was certainly (in the words of *In re Estate of Martin, supra*) an issue "touching the estate". The transaction constituted the sale of the principal asset of the incompetent's estate. The court clearly had authority to satisfy itself that the estate had not been unfairly depleted as a result of that transaction. The court did so by appointing a guardian ad litem to investigate the transaction and determine whether the price paid was reasonable. The guardian ad litem's rectitude in conducting this investigation is not questioned by appellants.

The court's adoption of the recommendations of the guardian ad litem and the subsequent order confirming the sale were consequently entirely within the court's powers in the guardianship proceeding. There was therefore no irregularity which would justify vacation of the order confirming the sale.

Appellants next argue that the order should be set aside

under CR 60(b)(4). This rule provides for the vacation of an order for fraud, misrepresentation, or other misconduct of an adverse party.

Appellants in this argument rely principally on the rule that dealings such as the disputed sale between an attorney and client are prima facie fraudulent. They argue that this presumption of fraud satisfies CR 60(b)(4).

■ Appellants are correct in their contention that the transaction is prima facie fraudulent.

> It has been held that dealings between an attorney and his client which are advantageous to the attorney are prima facie fraudulent and the burden is on the attorney to show the good faith of such a transaction. *In re Estate of Peterson*, 6 Wn.2d 294, [311,] 107 P.2d 580 (1940).

*Sparkman & McLean Co. v. Derber*, 4 Wn. App. 341, 350, 481 P.2d 585 (1971). This presumption is not sufficient, however, to justify vacation of the order confirming the sale. The propriety of that sale was the very issue before the trial court on the motion for confirmation. The court resolved the issue by appointing the guardian ad litem to investigate the circumstances of the sale. Appellants' argument, in effect, is that they should be entitled pursuant to CR 60(b)(4) to relitigate that issue. We cannot agree that the rule allows a party to relitigate an issue of fraud placed squarely before and decided by the trial court. Accordingly, we conclude that the court below did not abuse its discretion in refusing to vacate the order of confirmation under CR 60(b)(4).

Appellants make arguments that the order should have been vacated under CR 60(b)(5), (6), and (11). These arguments are essentially restatements of those already considered and require no additional discussion.

We conclude, therefore, that the trial court did not abuse its discretion in denying the motion to vacate the order confirming the sale.

We consider finally the matter of attorney fees. Watkins was awarded $7,015 in attorney fees but was denied approximately $2,500 appraisers' fees incurred in defending

the action. He argues on appeal that the award of fees is authorized by RCW 11.92.180, which provides:

> A guardian or limited guardian shall be allowed such compensation for his services as guardian or limited guardian as the court shall deem just and reasonable. . . . In all cases, compensation of the guardian or limited guardian and his expenses including attorney's fees shall be fixed by the court . . .

Watkins argues that this provision entitles him not only to attorney fees, but the appraisers' fees.

■ This argument is without substantial merit. The statute authorizes an award of fees only for "services as guardian". The litigation in this case, although occurring in the context of guardianship proceedings, was not a part of Watkins' services on behalf of Mrs. Adamec. The litigation was generated by a transaction entered into by Watkins in his personal capacity, and not as guardian of Mrs. Adamec. In defending the action, Watkins was defending his own interests rather than those of Mrs. Adamec. The fees and costs were therefore not incurred in respect of his services as guardian. The trial court's award of fees is accordingly reversed.

The trial court's denial of the motion to vacate the order confirming the sale is affirmed, and the award of attorney fees is reversed. Neither Watkins nor the Shriners should be awarded costs on appeal. The Administrator's costs and fees should be chargeable to the estate.

WILLIAMS, C.J., ROSELLINI, STAFFORD, UTTER, BRACHTEN-BACH, DOLLIVER, and DIMMICK, JJ., and CUNNINGHAM, J. Pro Tem., concur.