[No. 29762. *En Banc.* January 3, 1947.]

*In the Matter of the Estate of* MARGARET WHITTIER, *Deceased.*[1]

[1]Reported in 176 P. (2d) 281.

834

*H. A. Martin* and *Wm. S. Bell,* for appellant.

*C. E. Hughes,* for respondent.

STEINERT, J.—Subsequent to the admission to probate of a decedent's will and the confirmation of appointment of the executor named therein, and during the early progress of administration upon the decedent's estate, an acquaintance or friend of the deceased filed a petition in the cause offering

for probate a later document of a purportedly testamentary nature, which named only the petitioner as legatee and bequeathed to her a portion of the decedent's estate; petitioner's prayer was that the order admitting the previously executed will to probate be annulled and set aside, that the later document be admitted to probate as the will of the decedent or else as a codicil, and that the petitioner be appointed administratrix with the will annexed.

The executor answered, denying the material allegations of the petition and pleading affirmatively that, at the time the decedent signed the later document, she was of unsound mind, lacked testamentary capacity to execute that document, and was acting under duress and undue influence exerted upon her by the petitioner. The affirmative allegations of the answer were denied by petitioner's reply.

After a hearing on the issues thus presented, the trial court took the matter under advisement and, a month later, rendered a memorandum opinion, in consequence of which an order was entered admitting the challenged document to probate as the last will and testament of the decedent, superseding the previously executed will to the extent that the two instruments were inconsistent, and directing the executor to distribute to the petitioner the property described in the later document as offered by her. From that order the executor appealed.

At the time of her death on August 5, 1944, decedent, Margaret Whittier, was a widow eighty-two years of age. Her husband, Bert Whittier, died in 1933. For many years prior to the husband's death, the Whittiers owned a one-half interest in a parcel of real estate situated on Boylston avenue in the city of Seattle and improved with a duplex building consisting of two stories and an attic. The lower floor was designated by street number as 1417, and the upper two floors as 1419. During the period of their part ownership of the premises, Mr. and Mrs. Whittier occupied the upper two floors as their home, and, after Mr. Whittier's death, his widow continued in occupancy thereof.

Mr. William S. Bell, an attorney in Seattle, and his wife were intimate friends of the Whittiers, their acquaintance-

ship dating back to 1892. Mr. Bell had attended to Mr. Whittier's legal business during the greater part of the latter's lifetime, probated his estate, and thereafter continued to act as friendly adviser and legal counselor for Mrs. Whittier. In 1931, Mr. Bell drew Mrs. Whittier's will, which she executed. In 1933, he drew a second will for her, which she also executed. Neither of those wills, however, is involved in this action.

In 1937, Mr. Bell drew a third will for Mrs. Whittier, which she executed on December 15th of that year. In that will, which was of the nonintervention type, the testatrix bequeathed the sum of one thousand dollars to her sister-in-law, Lucy F. Whittier; devised a certain unimproved tract of land in Seattle to her niece, Margaret S. Galley, a resident of Oregon; devised to three persons, whose relationship to the decedent is not clearly shown but two of whom bore the name of Whittier, her undivided interest in the property on which the duplex building above mentioned is located; bequeathed and devised all the remainder of her estate, of whatsoever kind and wheresoever situate, to her sister, Mary E. Galley, a resident of Oregon; nominated William S. Bell as executor of the will; and revoked all former wills made by her.

It is conceded that Mrs. Whittier was a well-educated woman, a constant reader, a follower of the current news of the day, a good conversationalist, and a person of sociable habits. A number of letters and cards written by her years ago and admitted in evidence in the case evince not only a good command of language on her part, but also a penmanship that was easily legible. It is beyond dispute, however, that the death of her husband in 1933, when Mrs. Whittier was about seventy-one years of age, was a serious shock to her, and that from that time on she gradually failed in physical health and mental vigor.

During the year 1939, Mrs. Caroline E. Hutchinson, a widow, went to live with Mrs. Whittier, at the latter's request, in the duplex building. Mrs. Hutchinson was of approximately the same age as Mrs. Whittier, and a close friendship had existed between them since about 1903. Mrs.

Hutchinson was also an intimate friend of Mrs. Whittier's sister, Mary E. Galley, who, with her daughter, Margaret S. Galley, resided in Hubbard, Oregon.

Mrs. Ida Irene Woodland, the petitioner and respondent herein, has for a number of years resided in Seattle and, prior to August 1941, owned and operated successively a number of rooming houses in the general vicinity of the Whittier home. She was not acquainted, however, with Mrs. Whittier.

During the summer of 1941, Mrs. Woodland was endeavoring to find, purchase, and use as a rooming house some desirable place located in the vicinity of "First Hill," which is a general designation of the locality in which both she and Mrs. Whittier were then living. Through a real estate agent, she became interested in purchasing the duplex building mentioned above.

As a result of negotiations conducted between the realtor and Mr. Bell, a real estate contract was entered into on August 14, 1941, wherein Mrs. Whittier and her co-owner of the Boylston avenue property agreed to sell and Mrs. Woodland agreed to buy that property for the sum of $5,250, of which $1,000 was then paid in cash, the balance of the purchase price to be paid in monthly installments of $42.50, inclusive of interest.

A few days thereafter, Mrs. Woodland took possession of the property. Mrs. Whittier continued to live in the duplex house, renting quarters from Mrs. Woodland. Mrs. Hutchinson also remained and, apparently under some arrangement with Mr. Bell, took care of Mrs. Whittier, who by that time had become quite feeble in health and was unable to look after her affairs.

Shortly after Mrs. Woodland moved into the place, Mr. A. W. Baker, who subsequently figured in the challenged document involved in this action, became a tenant of Mrs. Woodland and occupied a room on the attic floor of the building. Mr. Baker was a friend of Mrs. Woodland and had rented rooms from her at various places in times past.

By the first of January, 1942, Mrs. Whittier's mental deterioration had become very noticeable to those who knew

her. Its particular manifestation was that she was extremely forgetful and seemed to be unable to comprehend the nature and importance of matters relating to her financial affairs. Testimony was given relating to marked changes in her habits, to untidiness in contrast with her former neatness of appearance, to outbursts of weeping and moaning, to pleasure in sympathetic attention, and to a progressive decline in her mental powers, all symptomatic of senile dementia. Mr. Bell visited her frequently, endeavoring not only to look out for her physical welfare, but also to see that any business matters in which she was concerned received proper attention.

It is clear from the evidence, and nowise disputed, that from the time of Mrs. Woodland's arrival upon the premises and continuously thereafter throughout the period of time here involved, she manifested a very deep interest in Mrs. Whittier, calling her by her first name, and addressing her in affectionate terms. She spent considerable time in Mrs. Whittier's quarters and frequently took her out for short walks and occasionally for an automobile ride.

For some reason or other, however, Mrs. Woodland did not get along well with Mrs. Hutchinson, who was Mrs. Whittier's companion. Mrs. Woodland seems to have entertained a suspicion that Mrs. Hutchinson was imposing on Mrs. Whittier and was inducing her to sign checks drawn in Mrs. Hutchinson's favor. At any rate, in January, 1942, Mrs. Woodland made a trip to Tacoma in company with Mrs. Whittier and Mr. Baker, and from that city telephoned to Miss Galley, Mrs. Whittier's niece, residing in Hubbard, Oregon. In that conversation, Mrs. Woodland suggested that, because of Mrs. Whittier's mental condition, a guardian should be appointed to manage her affairs; she also intimated that Mrs. Hutchinson was the cause of the present difficulty. About that same time, Mrs. Woodland got possession of three checks, totaling fifty-five dollars, which had been drawn by Mrs. Whittier in favor of Mrs. Hutchinson and cashed by the latter; these checks Mrs. Woodland sent to Miss Galley in corroboration of her former complaint made over the telephone.

Miss Galley did not react favorably to Mrs. Woodland's statements, but nevertheless communicated at once with Mr. Bell, suggesting that something be done immediately with regard to her aunt. Shortly thereafter, Mr. Bell conferred with Mrs. Woodland and, as a result of the information given him by her, on January 19, 1942, prepared a petition for the appointment of a guardian for Mrs. Whittier. That petition, however, was never filed, and no immediate proceedings with reference thereto were taken.

We come now to the crucial event in this case, involving the execution by Mrs. Whittier of the document which constitutes the basis of this controversy. The testimony with reference to that event comes entirely from the lips of Mrs. Woodland and two of her witnesses. The substance of their testimony on the particular subject was as follows:

On the night of April 28, 1942, between nine and ten o'clock, Mrs. Woodland, whose room was across the hall from that of Mrs. Whittier, heard Mrs. Whittier groaning, as she had heard her on other occasions. Mrs. Woodland thereupon went into Mrs. Whittier's room and found the latter lying, dressed, on her bed and evidently in distress. Mrs. Whittier had just previously rapped on the wall to attract the attention of Miss Boudreau, a nurse, who occupied an adjoining room. Shortly thereafter, Mrs. Whittier arose from her bed and went to the door of Miss Boudreau's room, knocked, and requested the latter to come over and "take her pulse." Miss Boudreau escorted Mrs. Whittier back into the latter's room, took her pulse, assured her that she was all right, and persuaded her to lie quiet for a while. Miss Boudreau testified that, at this time, Mrs. Whittier "wasn't feeling well," and she "was very upset." In the presence of Mrs. Woodland and Miss Boudreau, Mrs. Whittier announced that she did not feel well and further stated that she wanted to give, or leave, to Mrs. Woodland some of her personal belongings.

A few minutes later, Mrs. Whittier proceeded alone up to the attic floor and asked Mr. Baker to come down and witness her will. After these four persons had congregated in Mrs. Whittier's room, Mrs. Whittier again announced that

she wanted to leave some of her belongings to Mrs. Woodland because the latter had been "so nice and kind" to her. She thereupon proceeded to write out, on both sides of a small sheet of note paper, the document here in question, in words and figures as follows:

"Apr. 28, 1942

"I want Mrs. Irene Woo[d]land. to have all of my *fu**
Household furniture and personal affects My *Dimon*ds *g*ings and fur coat and ruggs dishes & Silver ware, and I also cancel the balance due me from her on the real estate contract on property for my share at 1419, and *14* and fourteen seventeen Boylston Ave.

"Because she was nice and did so much to make me happy after she bought my place.

"Margaret Whittier
"Witness"

Beneath the word "Witness," Marian E. Boudreau and A. W. Baker signed their names. Although the document is legible, it does not compare favorably with Mrs. Whittier's former handwriting, and parts of it can be deciphered only with difficulty.

Mrs. Hutchinson was not present during any part of this transaction, but was in her own room nearby. From Mrs. Woodland's testimony, however, it appears that Mrs. Hutchinson had heard, or in some way learned, that evening or shortly thereafter what had taken place for, on the following day, she, according to Mrs. Woodland's testimony, called Mr. Bell by telephone and told him that he had better have a guardian appointed for Mrs. Whittier because she "had willed her things" to Mrs. Woodland and "might will all the rest of the things away."

The record discloses that on April 29, 1942, the day following the execution of the document just mentioned, Mrs. Hutchinson signed a petition, which had been prepared by Mr. H. A. Martin, an attorney representing Mr. Bell, the executor, praying therein that Mr. Bell be appointed guardian of the person and estate of Margaret Whittier, on the grounds that the latter was an invalid of advanced age and that her mind was impaired to the extent that she was

* *Indicates deleted.*

incapable of managing her affairs. The petition was filed the same day and, on May 11, 1942, came on regularly for hearing before the probate court, at which time the court entered an order finding the facts alleged in the petition to be true and appointing Mr. Bell as such guardian.

The document mentioned above, executed by Mrs. Whittier on the night of April 28th, was evidently delivered immediately to Mrs. Woodland and remained in her possession until she offered it for probate, which was shortly after Mrs. Whittier's death. The document was never attached to the will of December 15, 1937, and, as is apparent from its contents, made no reference to that will.

From the time of the execution of the later document until March, 1943, Mrs. Whittier and Mrs. Hutchinson continued to occupy their quarters in the duplex building as before, Mrs. Hutchinson taking care of Mrs. Whittier and attending to her affairs under the supervision of Mr. Bell. By that time, however, Mrs. Hutchinson had become completely dissatisfied with the relations existing between herself and Mrs. Woodland. She therefore declined to stay longer and, accordingly, left. At the suggestion of Mrs. Woodland, Mr. Bell then employed, in succession, two other women to care for Mrs. Whittier. After both of those persons had resigned their positions, Mr. Bell made an arrangement with Mrs. Woodland in July or August, 1943, whereby she herself was to take care of Mrs. Whittier and receive therefor the sum of one hundred dollars a month. This arrangement lasted until December, 1943, by which time Mrs. Whittier's health and mental condition had so far deteriorated that she was taken to a rest home. Later, she was operated on for hernia. She was thereafter taken to another rest home, where she died August 5, 1944.

The will which Mrs. Whittier had executed December 15, 1937, was admitted to probate on August 7, 1944. It appears from the inventory and appraisement that Mrs. Whittier left an estate valued at $20,347.59, consisting of two parcels of unimproved real property valued at $850, the balance owing on the real estate contract with Mrs. Woodland amounting to $1,681.70, household furnishings and

personal effects, cash in bank, stocks, and bonds. The appraised value of the property covered by the document of April 28, 1942, was $2,541.70.

No notice of the initial probate proceedings was served upon or otherwise given to Mrs. Woodland. On September 7, 1944, however, she filed in the cause her petition for the probate of the document then in her possession. The result of the hearing on her petition has already been stated above. This appeal followed in consequence of the order made by the trial court.

In the brief filed by Mrs. Woodland as respondent herein, she moved to dismiss the executor's appeal, on the ground that his brief "contains no formal assignments of error as required by Rule 21, Rules of the Supreme Court," 18 Wn. (2d) 21-a, which, so far as is pertinent here, provides:

"No alleged error of the superior court will be considered by this court unless the same be clearly pointed out in the appellant's brief."

It may also be noted that Rule 16, Rules of this court, 18 Wn. (2d) 17-a, relating to contents and style of briefs, provides, in subd. (2) thereof, that the appellant's brief shall consist of certain specified matters, headed by titles thereof, one of such matters being designated as "Assignments of error"; further, that subd. (5) of that rule provides that each error relied on shall be clearly pointed out and discussed under appropriate designated headings.

Appellant's brief does not contain any formal specifications headed "assignments of error." However, it does contain a clear, concise, and definite statement of the questions involved on the appeal, as required by Rule 16, and clearly points out the alleged errors of the trial court, as required by Rule 21.

The "Statement of Questions Involved" covers the following questions, together with the rulings of the trial court thereon:

"1. Was Margaret Whittier competent to make testamentary disposition of her property on April 28, 1942? Answered by the trial court in the affirmative.

"2. Is the document bearing date April 28, 1942, peti-

tioner's [respondent's] exhibit 1, a testamentary disposition of property of the decedent Margaret Whittier? Answered in the affirmative by the trial court.

"3. Is petitioner's [respondent's] exhibit 1, the document dated April 28, 1942, offered for probate by petitioner, a codicil to or modification of the existing will of Margaret Whittier, dated December 15, 1937, and admitted to probate herein? Answered by the trial court in the affirmative.

"4. Did the trial court have the jurisdiction in this proceeding to make partial distribution of the estate of the decedent to the petitioner? Answered by the trial court in the affirmative."

■ The general rule upon the subject of assignment of error seems to be that, while mere arguments in an appellant's brief do not take the place of proper assignments of error, and while there must be a substantial compliance with the statutes or rules with reference thereto, nevertheless a clear statement of the questions presented for review, pointing out the errors for which a reversal is sought, may be treated as a sufficient assignment of error. We quote from some of the text writers dealing with the subject:

"Arguments in appellant's brief cannot take the place of proper assignments. But although not formally designated as such in a brief, a clear statement of the question presented for review may be treated as a sufficient assignment of error." 5 Bancroft's Code Pleading, Practice and Remedies (Ten-Year Supp.) 4325, § 7089.

"The statutes and rules of court in the various jurisdictions frequently specify the general form of assignments of error or grounds of appeal in the appellate courts. In order to be considered, assignments must be in accord with these statutory requirements. A substantial compliance with the statutes or rules is, however, all that is required." 3 Am. Jur. 292, Appeal and Error, § 701.

"The errors for which a reversal is sought should be specifically pointed out in the brief. Under some statutes and rules of court no precise form is prescribed for their statement; under others this should be accomplished by assignments of error; and under still others it is required that in addition to the formal assignments of error a concise statement of the controlling questions for decision shall be framed in such a manner that the points of law intended

for solution shall plainly appear, each one of which shall embrace all assignments of error which involves the legal principle stated in the statement.

"However, even though the rules call for an assignment of error, as a general rule, a formal assignment is unnecessary; and it is sufficient if the alleged errors are clearly stated under the head of points and authorities, or errors relied upon for reversal or through propositions." 4 C. J. S. 1870, Appeal and Error, § 1322.

In the case of *McKenzie v. Royal Dairy*, 35 Wash. 390, 77 Pac. 680, which was decided long before our rules provided for including in the appellant's brief a statement of the questions involved, this court held that a brief will not be struck out because it contains no formal assignments of error, where it is clear that the only alleged error is the sustaining of a demurrer to the complaint and where all the argument is directed to that point.

In *State ex rel. Rand v. Seattle*, 13 Wn. (2d) 107, 124 P. (2d) 207, we held that the omission from appellant's brief of a definite assignment of error as required by Rule 21 is not fatal, and that this court will consider the error claimed, where the contention that the trial court erred in a particular ruling so conclusively appears from the appellants' brief that a specific assignment could not more definitely call the alleged error to the attention of the court.

Upon the authority of the foregoing texts and cases, the motion to dismiss the appeal on that ground is denied.

■ Respondent also moved in this court that the judgment of the trial court be affirmed or, in the alternative, that the appeal be dismissed, on the ground that appellant failed to serve or file his opening brief within ninety days after notice of appeal, as required by Rule 11, Rules of the Supreme Court, 18 Wn. (2d) 12-a. Appellant's brief, though tardy, was filed prior to any motion on behalf of the respondent to dismiss the appeal. For that reason the motion is denied. *In re Peterson's Estate*, 6 Wn. (2d) 294, 107 P. (2d) 580; *Solberg v. Department of Labor & Industries*, 25 Wn. (2d) 156, 169 P. (2d) 701.

We come now to the merits of the case, involving the disputed validity of the document of April 28, 1942.

Touching the question of testamentary capacity on the part of Mrs. Whittier to execute that instrument, Mr. Bell, the executor, Miss Galley, the decedent's niece, and six other witnesses who had known Mrs. Whittier intimately for many years, all testified in effect that she was on that date, and for sometime prior thereto, mentally incompetent to transact business or to understand the meaning of a will. Seven witnesses, inclusive of the respondent, Mrs. Woodland, and the subscribing witnesses A. W. Baker and Miss Boudreau, testified that Mrs. Whittier was on that day, and ever since August, 1941, had been, mentally competent. None of respondent's witnesses, however, had known Mrs. Whittier prior to August, 1941, and all of them were close friends of Mrs. Woodland. While there was no formal attestation clause appended to the document, Mr. Baker and Miss Boudreau testified at the hearing that Mrs. Whittier had signed the document in their presence, declaring it to be her will, and that they had signed it at her request, in her presence, and in the presence of each other. Upon cross-examination, however, Miss Boudreau made admissions which raise in our minds considerable doubt as to whether Mrs. Whittier declared the document to be her *will*; and Miss Boudreau's testimony indicates that her participation in the transaction was simply an endeavor on her part to soothe Mrs. Whittier by indulging what seemingly to the witness was only a whim of the elderly woman.

■ After a careful consideration of the record before us, we will say that, had the trial court held that Mrs. Whittier was mentally *incompetent* to execute the document of April 28, 1942, we would have no difficulty in affirming such decision, for, in our opinion, Mrs. Whittier then and there lacked the necessary testamentary capacity. However, the testimony was in sharp conflict, and the trial court resolved that conflict to the point of holding that Mrs. Whittier was mentally competent to execute the document as a testamentary instrument. For the purposes of this case, we will accept the decision of the trial court, upon the principle expressed in *Pond's Estate v. Faust*, 95 Wash. 346, 163 Pac. 753, that:

"The advantage of the trial court in hearing the witnesses and noticing their demeanor and candor, sympathy or bias, while testifying is of more importance than usual, for the case practically hinges on the credibility and capacity of witnesses."

To the same effect, see *In re Forsman's Estate*, 177 Wash. 38, 30 P. (2d) 941.

For similar reasons, we accept the implied decision of the trial court that no duress nor undue influence was exerted upon Mrs. Whittier at the time she executed the challenged document.

This leaves for consideration the question whether, under the accepted facts, the document of April 28, 1942, was admissible in evidence as a testamentary disposition of the decedent's property. The solution of that problem depends upon the answers to two other questions: (1) whether the document constituted or operated as an independent will or whether it served simply as a codicil to the decedent's former will of December 15, 1937; and (2), its character in the one respect or the other having been determined, whether it complied with the requirements of the law as pronounced by this court with reference to the admissibility of such instrument to probate.

As stated above, the document in controversy was not *attached* to the previously executed and existing will, nor did it make any reference whatever to that will.

The term "codicil" is of ancient origin and, between the time of its original conception and its modern application, has undergone a marked change in significance. Mr. James Schouler in volume I of his work on Wills, Executors and Administrators (6th ed.) 6, § 7, says:

"A codicil is in modern practice a sort of postscript to a will, being an exposition of the testator's afterthought. This word is derived from the Latin word *codicillus*, which is a diminutive of *codex*, and literally imports a little code or writing—a little will. Codicils came into our law from the Roman jurisprudence, but with an earlier significance quite different from that which modern usage attaches to them. As Blackstone has observed, the codicil is the testator's addition annexed to, and to be taken as part of the testament; 'being for its explanation, or alteration, or to make some

addition to, or else some subtraction from, the former dispositions of the testator.' "

The substance of the various decisions in this country defining the term "codicil," explaining the function of such instrument, and marking its limitations, is succinctly stated in 68 C. J. 412, Wills, § 2, as follows:

"A 'codicil,' in reality, is a will. However, it is not a new will; a 'codicil' is a supplement to, an addition to or qualification of, an existing will, made by the testator to alter, enlarge, or restrain the provisions of the will, to explain or republish it, or to revoke it. A codicil is dependent for its life and force on the life and force of the will to which it is an adjunct. It does not supersede the will, as an after-made will would do; it is a part of the will, codicil—or codicils—and will making only one will. In its strict and primary sense, the word 'codicil' means a testamentary instrument which would, per se, become valid immediately on the death of the testator."

In 1 Page on Wills (Lifetime ed.) 840, § 466, the term is defined as follows:

"A codicil is an instrument which is testamentary in its nature but which is intended to operate as a modification of an existing will, and not as a new will in itself."

■ Reading many cases on the subject enables and leads us to say that a codicil is an instrument of a testamentary nature, the purpose of which is to change or alter an already executed will by adding to and enlarging, subtracting from and restricting, or qualifying, modifying, or revoking the provisions of a prior existing will.

■ Whether a particular testamentary instrument is a codicil or a later will depends upon the intention of the testator or testatrix as indicated by the words used in the instrument together with the admissible evidence of the surrounding circumstances. 1 Page on Wills (Lifetime ed.) 840, § 466.

■ In this instance, while there were no words of art appropriate to a codicil, yet the surrounding circumstances indicated that Mrs. Whittier intended the document to qualify or modify the provisions of her will of December 15, 1937. We draw this conclusion from the following circum-

stances: She was found by the trial court to have had testamentary capacity at the time she executed the later document. Accepting such finding of the court, as we do for the purposes of this case, we must assume that she had at least a general recollection of her estate and of her prior will, which is indeed conceded by counsel for respondent. She purported to dispose of only a minor part of such estate. Lastly, there is no indication that she intended to have the later document serve as her last and *only* will. Cf. *Gardner v. McNeal,* 117 Md. 27, 82 Atl. 988, Ann. Cas. 1914A, 119, 40 L. R. A. (N.S.) 553.

We therefore hold that the document of April 28, 1942, is a codicil, intended to operate as a modification of the will of December 15, 1937.

The second, and final, question then is whether the codicil, as such, was admissible to probate. Appellant contends that it was not entitled to be admitted to probate because it was not *attached* to the will which it, in effect, modified. The authority upon which this contention is based is Rem. Rev. Stat., § 1414 [P.P.C. § 219-37], which is a part of our probate code and reads as follows:

"The term 'will,' as used in this chapter, shall be so construed as to include all *codicils attached to any will.*" (Italics ours.)

That section of the statute, being § 44, Laws of 1917, p. 653, was adopted in its present form in 1860, chapter 2, p. 172, § 41, Laws of Wash. Terr. 1857-1860, and amended chapter 7, p. 319, § 49, Laws of Wash. Terr. 1854, which read:

"The term 'will,' as used in this act shall be so construed as to include all codicils, *as well as wills.*" (Italics ours.)

Appellant argues that this change in the wording of the original statute clearly indicates that the legislature intended that a codicil, to be effective as a testamentary instrument, must be *attached* to the will which it is intended to modify, and that from this it follows that, if the codicil is not so attached, as was the case in the present instance, it cannot be construed to be, or operate as, a will or part of a will. Respondent, on the contrary, argues that this statute means simply that a codicil must be executed with the

same formality as a will, and does not *require* that a codicil be attached to the will which it modifies.

It is not necessary, in this case, to determine which of these two contentions is correct, for we have here a situation where the codicil was not only *not* attached to the will, but also made no reference whatever to it. This court has expressed itself with reference to just such a situation in *State ex rel. Schirmer v. Superior Court,* 143 Wash. 578, 255 Pac. 960. In view of the controlling effect of that decision, we shall analyze and discuss that case at some length. In doing so, we have had recourse to the record therein for a fuller ascertainment of the exact facts.

On August 13, 1924, one Karolina Waigel, a resident of Kalispell, Montana, executed her will in that city, making bequests and devises to certain of her grandchildren, and to their mother, named therein, and leaving the rest of her estate to her daughter, Katie Schirmer, who was therein also appointed executrix of the will. Two persons having the name of Foot and residing in Kalispell signed the will as attesting witnesses. That will was never offered for probate independently. On February 28, 1926, in the city of Spokane, Washington, Mrs. Waigel executed another will "cancelling" all other wills theretofore executed by her, making certain bequests and devises to the grandchildren previously remembered and also to two other grandchildren and a daughter-in-law; and leaving one half of the remainder of her estate to her daughter, and the other half to her grandson C. E. Schirmer, who was appointed executor of the will. The witnesses to that will were George M. Nethercutt and C. E. Schirmer, the grandson and beneficiary.

On October 1, 1926, in Spokane, Mrs. Waigel executed a document, labeled "Codicil," wherein this language appears:

"I . . . do now make, constitute and declare this instrument to be made in the interest of my heirs in *said will heretofore mentioned.*" (Italics ours.)

The codicil then merely provided that the income from the portion of the estate bequeathed and devised to the daughter Katie Schirmer should be paid to her annually,

but that the principal thereof should not be paid to her until ten years after the death of the testatrix. The codicil was likewise signed by George M. Nethercutt and C. E. Schirmer. The codicil, though designated as such, was never attached to the will, but was kept separate therefrom, and, despite the language quoted above, made no specific reference to the will of February 28, 1926, or to any other will.

Upon the death of Mrs. Waigel, the executor and grandson, C. E. Schirmer, petitioned the court for probate of the will of February 28, 1926, and also of the alleged codicil of October 1, 1926. In contemplation of the possible illegality of the will of February 28, 1926, the proponents also offered proof of the execution by the deceased of the earlier will of August 13, 1924. The trial court held, as appears by its full memorandum opinion and subsequent order, (1) that neither the will of February 28, 1926, nor the codicil could be admitted to probate, for the reason that C. E. Schirmer, the executor and a beneficiary under the will, was disqualified to act as an attesting witness to either instrument, and therefore both instruments lacked sufficient attestation to constitute either of them the testament of the deceased; and (2) that the will of August 13, 1924, was not entitled to be admitted to probate because by the subsequent will the testatrix specifically revoked the former will, although the later will was not itself admissible to probate. The court thereupon entered the order denying probate of any and all of the three instruments above mentioned.

On appeal from that order, this court held, with respect to the will of February 28, 1926, that, under the provisions of Rem. Comp. Stat., § 1408 [now Rem. Rev. Stat., § 1408], C. E. Schirmer was rendered competent as an attesting witness thereto, but, at the same time, the legacy to him was avoided; further, that C. E. Schirmer was not, by reason of that situation, disqualified to act as executor. In consequence of those conclusions, this court directed that the will of February 28, 1926, be admitted to probate. That, of course, disposed of the will of August 13, 1924.

With reference to the alleged codicil, dated October 1,

1926, this court held that its rejection by the trial court was proper. That issue was disposed of by the court in the following language:

"The so-called codicil to the will is not in this case connected with the will in any way sufficient to identify it, and its rejection was therefore proper."

■ It will be observed that the codicil involved in that case presented a stronger basis for its admission to probate than does the codicil in this case. There, the document was not only labeled "codicil," but also did make reference to *some* will "heretofore mentioned," although it did not specifically identify the particular will which the testatrix may have had in mind. Here, the codicil, regarded as such, makes no reference to any will whatever, either by special reference or by implication.

Since the codicil in this case was not *attached* to the will nor made any reference whatever to it, the *Schirmer* case is controlling, and the document was therefore not entitled to be admitted to probate.

The order of the trial court is reversed, with direction to enter an order denying probation of the document of April 28, 1942.

ROBINSON, JEFFERS, MALLERY, CONNELLY, SCHWELLENBACH, and ABEL, JJ., concur.

MILLARD, J. (dissenting)—Margaret Whittier, age 82 years, died in the city of Seattle August 5, 1944. By nonintervention will executed December 15, 1937, she gave to some of her relatives all of her estate of the appraised value of slightly more than twenty thousand dollars. On petition of her executor the will was admitted to probate August 7, 1944.

One Irene Woodland, after purchasing from Mrs. Whittier in August 1941 certain real property on real estate contract on which there was due a balance of nearly seventeen hundred dollars when Mrs. Whittier died, was very attentive to her vendor. Irene Woodland filed petition September 7, 1944, for entry of an order setting aside order entered August 7, 1944, admitting to probate the will executed

December 15, 1937, and that the last will and testament of decedent dated April 28, 1942, be admitted to probate either as a will of the decedent or as a codicil to the will executed December 15, 1937.

The purported will or codicil, which is in the handwriting of Mrs. Whittier, and disposes of only a fraction of her estate, reads as follows:

"April 28, 1942

"I want Mrs. Irene Woo[d]land to have all of my household furniture and personal affects my diamonds rings and fur coat and ruggs dishes and silver ware, and I also cancel the balance due me from her on the real estate contract on property for my share at 1419 and and fourteen seventeen Boylston Ave because she was nice and did so much to make me happy after she bought my place.

"Margaret Whittier"

"Witness Marian E. Boudreau

"A. M. [or W] Baker"

The two witnesses, who lived in the same building in which decedent resided, to the foregoing testified that at request of Mrs. Whittier who called at their rooms between 9:15 and 10:00 p. m. April 28, 1942, they returned with her to her room, saw the decedent write the above, and at her request signed the paper as witnesses in the presence of the decedent and in the presence of each other. They further testified that Irene Woodland was present. Mrs. Woodland's testimony corroborates that of the two witnesses to the paper.

The court expressed the view that, at the time she executed the writing of April 28, 1942, admitted in evidence as exhibit No. 1, Margaret Whittier was mentally competent to make her will and in doing so was not acting under duress or undue influence of any person; that she wrote the document herself, intended it for and as her last will and testament, and so declared, and that "under the law and the evidence it is a valid will entitled to be admitted to probate."

The court entered an order admitting document dated April 28, 1942 (exhibit No. 1), to probate as the last will and testament of Margaret Whittier, deceased, and decreed that it supersedes and revokes the will dated December 15, 1937,

"insofar as the said two wills are inconsistent or incompatible." The order directs executor Bell to distribute to the petitioner the property described in exhibit No. 1, to forthwith cancel the balance due on the real estate contract, and awarded judgment against the executor for all payments made by petitioner on the contract subsequent to the death of Mrs. Whittier. The executor has appealed.

Respondent moves affirmance of the judgment on the ground that appellant's brief contains no assignments of error as required by rules of this court.

Rule 16, subd. (2), Rules of Supreme Court, 18 Wn. (2d) 17-a, provides that in all appeals, the brief of appellant *shall,* not *may,*

"consist of the following matters, headed by the title thereof in distinctive type, or in type distinctively displayed, in the following order:
"(a) Table of cases;
"(b) Statement of questions involved;
"(c) Statement of the case;
"(d) Assignment of error;
"(e) Argument for appellant."

Subdivision 5 of Rule 16, *supra,* reads, so far as pertinent, as follows: "Each error relied on shall be clearly pointed out and discussed under appropriate designated headings."

There is no assignment of error in appellant's brief. We held in *Hafer v. Marsh,* 16 Wn. (2d) 175, 132 P. (2d) 1024; that, in the absence of any assignment of error, an appellant is not entitled to have the contentions on his appeal considered.

Under that branch of his brief entitled "Argument" in distinctive type, appellant makes four inquiries and under each interrogation he submits an argument in the negative to sustain his position. The questions, which are not assignments of error, are as follows:

(1) "Is Petitioner's Exhibit 1 Admissible as a Testamentary Document under the Statutes of Washington?"

(2) "Was Petitioner's Exhibit 1 Established as a Testamentary Document?"

(3) "Was Margaret Whittier, the Decedent, Competent in April, 1942, to Execute a Will?"

(4) "Did the Lower Court Have Jurisdiction to Enter an Order in This Proceeding Directing the Executor to Turn Over to the Petitioner the Property Described in Petitioner's Exhibit 1, and to Enter a Money Judgment Against the Executor?"

Rule 21, Rules of Supreme Court, 18 Wn. (2d) 21-a, reads as follows:

"No alleged error of the superior court will be considered by this court unless the same be clearly pointed out in the appellant's brief: *Provided,* That the objection that the lower court had no jurisdiction of the cause or that the complaint does not state sufficient facts to constitute a cause of action, or that the supreme court has no jurisdiction of the appeal, may be taken at any time."

Appellant argues that two of the errors upon which he relies for reversal are within the exception to the general rule, which Rule 21, recognizes, that no alleged error of the trial court will be considered by this court unless the same be clearly pointed out in appellant's brief. It is insisted that the error in admitting exhibit No. 1 as a testamentary document is a plain or fundamental error apparent on the record, hence no assignment of such error was necessary; and (2) the trial court acted beyond its jurisdiction in making a partial distribution of the estate and in entering a money judgment against appellant, which is a fundamental error apparent on the face of the record of which this court will take notice without a formal assignment of error.

The rules which require appellant to set out in his brief the errors upon which he relies for reversal are important and should be followed. While we have the power to change the rules of this court, we should not except a particular individual from their operation or excuse their violation in a particular instance. *State v. Currie,* 200 Wash. 699, 94 P. (2d) 754.

The incorporation into Rule 21, *supra,* of the exception that we will consider, without any assignment of error, the trial court's want of jurisdiction over the subject matter, added nothing to the broad discretionary power of this court to consider fundamental errors apparent on the face of the record, even if such errors were not properly assigned.

The superior courts sitting in probate are courts of general jurisdiction, including all matters in probate. Jurisdiction does not depend upon whether a judgment is correct or incorrect, but rather upon the question whether the court has the power to hear and determine the subject matter in controversy. *Tucker v. Brown,* 20 Wn. (2d) 740, 150 P. (2d) 604.

Let us concede, *arguendo,* that the superior court, which is a court of general jurisdiction, erred in admitting exhibit No. 1 as a testamentary document and erred in making a partial distribution of the estate and in entering a money judgment against the executor. That the court had jurisdiction over the subject matter of the controversy needs no citation of sustaining authority, hence mere errors in the method of exercising its jurisdiction are not fundamental and are not within the exception to Rule 21, Rules of the Supreme Court. 4 C. J. S. 1736, § 1239.

As his brief does not contain any assignment of error, as required by the rules of the court, appellant is not entitled to have the contentions on his appeal considered.

When this cause was assigned to the writer, he wrote the foregoing in the hope that the court would honor its own rules, in view of its recent holding (*Hafer v. Marsh,* 16 Wn. (2d) 175, 132 P. (2d) 1024) that the rule in question must be followed. Our later opinions (*Dill v. Zielke, ante* p. 246, 173 P. (2d) 977, and *State v. Brown, post* p. 857, 176 P. (2d) 293) clearly declare that we are consistent only in inconsistency.

We are so vacillating, so lacking in regard for our rules—enforcing them in one case and by sophistical reasoning nullifying them in another when the two cases are indistinguishable except as to names of parties—that our opinions might aptly be entitled "Moods of the Supreme Court."

The great number of rules we have promulgated in even the past fifteen years may be accepted as some evidence of our delight in adopting and publishing rules. Our too frequent breaches of those rules "in the middle of the game" evince our delight in breaking them.

"Like children playing by the ocean who build sand-

towers with constancy, and then destroy them with laughter." See "The Prophet," by Kahlil Gibran.

As observed by Mr. Justice Roberts in his dissenting opinion in *Smith v. Allwright,* 321 U. S. 649, 64 S. Ct. 757,

"The instant decision · . . . tends [like others in which opinions will soon be published] to bring adjudications of this tribunal into the same class as a restricted railroad ticket, good for this day and train only.· I have no assurance, in view of current decisions, that the opinion . . . today may not shortly be repudiated and overruled by justices who deem they have new light on the subject. . . . It is regrettable that in an era marked by doubt and confusion, ,an era whose greatest need is steadfastness of thought and purpose, this court . . . should now itself become the breeder of fresh doubt and confusion in the public mind as to the stability of our institutions."

The following language in the dissenting opinion of Mr. Justice Roberts in *Mahnich v. Southern S. S. Co.,* 321 U. S. 96, 64 S. Ct. 455, is also apt:

"Respect for tribunals must fall when the bar and the public come to understand that nothing that has been said in prior adjudication has force in a current controversy."

Judge Robinson, speaking for this court in *State v. Currie,* 200 Wash. 699, 94 P. (2d) 754, said:

"It is true that the court has the power to change and rewrite the rule, but that is a very different thing from excepting a particular individual from its operation or excusing its violation in a particular instance."

In that case, a defendant, convicted of being an habitual criminal and sentenced to confinement in the state penitentiary for life, attempted to personally conduct his appeal. We dismissed his appeal because he failed, in his ignorance of rules of procedure, to timely perfect his appeal. We said that:

"In attempting to conduct his own appeal, the appellant assumed an undertaking which was far beyond his capacity and understanding."

We refused to relax the rule which requires speedy determination of criminal appeals and denied to a man who

had been sentenced to life imprisonment a review in this court simply because, in his ignorance, he had not complied with certain technical rules. It should be noted, however, that in *State v. Brown, supra,* we stated, in effect, that nothing we had said in prior opinions had any force in a current controversy.

Bad laws and rules can be endured; but the uncertain law or rule—one that shifts and changes each time it is invoked in the courts

" . . . is as sore an evil and as heavy a curse as any people can suffer." *Hole v. Rittenshouse,* 2 Phila. 411, 417.

The judgment should be affirmed on the ground that there is no assignment of error in appellant's brief.

SIMPSON, J., concurs with MILLARD, C. J.

January 30, 1947. Petition for rehearing denied.

[1]Reported in 176 P. (2d) 293.